### In re The GRAND UNION COMPANY, Debtor.

### Bankruptcy No. 95–84–PJW.

United States Bankruptcy Court, D. Delaware.

Jan. 17, 1997.

James L. Patton, Jr., Laura Davis Jones, S. David Peress, Scott D. Cousins, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Brian E. O'Connor, Willkie Farr &

Gallagher, New York City, for The Grand Union Company.

Neal J. Levitsky, Agostini, Levitsky & Isaacs, Wilmington, DE, for Mitra and Habib Nayerahamadi.

William P. Bowden, Ashby & Geddes, Wilmington, DE, Alan E. Marder, Shaw, Licitra, Parente, Esernio & Schwartz, P.C., Garden City, NY, for Donna Jason.

John D. Mattey, Ferry, Joseph & Fink, P.A., Wilmington, DE, for Chris Economaki.

### MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

The Grand Union Company's ("Grand Union") plan of reorganization was confirmed on May 31, 1995. This is the Court's ruling with respect to the motions by three separate claimants seeking leave to file late proofs of claims. For the reasons discussed below, I will grant the motions.

### FACTS

This Chapter 11 case proceeded on a "fast track." It involved a pre-negotiated plan, that is, the essential terms of the plan of reorganization were negotiated with and agreed upon by major creditor groups prior to the filing of the petition. Pursuant to the confirmed plan, only the claims of major lender groups were impaired; trade claims and general unsecured creditors were unimpaired. The three movants hold general unsecured claims.

Grand Union's Chapter 11 petition was filed on January 25, 1995. Its plan of reorganization and disclosure statement were filed on February 6, 1995 and both of those documents were amended on March 22, 1995. Pursuant to Grand Union's motion, on April 6, 1995, the Court signed an order setting the May 11, 1995 bar date for filing proofs of claims. The bar date notice was mailed to creditors on April 11, 1995. Grand Union's certification of the mailing of the bar date notice shows that the notice was mailed to each of the three claimants at their respective residences. The plan of reorganization was confirmed on May 31, 1995.

The bar date notice, bearing the caption of the case, is titled: "Notice Of Last Date For The Filing Of Certain Proofs Of Claim." It is not a simple document. It is a four-page single spaced writing, exceeding 1,000 words, couched in legalese and referencing a number of sections of the Bankruptcy Code so that only someone trained in the law and having a working knowledge of the Bankruptcy Code could fully comprehend its meaning and effect upon a first reading.

The subject motions are made by individuals who claim they sustained personal injuries on Grand Union's premises allegedly as the result of Grand Union's negligence. In each case, the alleged injuries occurred a considerable period of time prior to the filing of the Chapter 11 petition.

The essential facts regarding each of the three motions are not in dispute and they are summarized as follows.

*Mitra Nayerahamadi ("Nayerahamadi"):*

Nayerahamadi sustained her injuries while on the Grand Union premises on July 26, 1994. For personal injury claims, Grand Union is self-insured up to a limit of $500,000. It appears that at any one time, Grand Union may have several hundred personal injury claims pending against it. In resolving personal injury claims short of litigation, Grand Union retained Scott Wetzel Services, Inc. ("Scott Wetzel"), a risk management firm. Scott Wetzel served as Grand Union's agent in dealing with personal injury claimants, negotiating resolutions and otherwise attempting to resolve claims short of litigation.

It is not clear whether Nayerahamadi communicated directly with Scott Wetzel regarding her claim. However, at some point, she retained counsel to pursue her claim against Grand Union. By a letter dated November 8, 1994, Mr. James Stover ("Stover") of the Philadelphia, PA firm of Abramson & Denenberg, P.C. wrote to Scott Wetzel regarding the Nayerahamadi claim. In his November 8, 1994 letter, Mr. Stover noted that he had been attempting to reach Scott Wetzel by phone and decided to write the letter in order to have Scott Wetzel confirm that it was the claims adjuster handling the Nayerahamadi matter on behalf of Grand Union. Among other things, Stover's November 8, 1994 letter to Scott Wetzel asked Scott Wetzel to "kindly acknowledge our representation." (Doc. # 1087, Ex. B) On May 2, 1995, Scott Wetzel wrote a letter to Stover regard-

ing the Nayerahamadi matter and in that letter, confirmed a discussion they had had on that date regarding the claim. Among other things, the May 2, 1995 letter specifically acknowledged Stover's representation of Nayerahamadi. The letter also stated that "I look forward to bringing this matter to an amicable conclusion as soon as my client's bankruptcy proceedings are concluded." (Doc. # 1087, Ex. C)

While Nayerahamadi acknowledged receiving the notice of Grand Union's Chapter 11 filing and receiving a copy of the disclosure statement, she denies having received any other written communications regarding the Grand Union bankruptcy, including the bar date notice. (Tr. 27–28) Nayerahamadi testified that she had no real understanding of what the Chapter 11 filing meant. (Tr. 28, 30) During the pendency of the Chapter 11 case, Stover received nothing in writing directly regarding the Grand Union bankruptcy, other than the reference to the bankruptcy in Scott Wetzel's May 2, 1995 letter. (Tr. 38–40) Stover did receive from his client a copy of the filing notice and the disclosure statement. Stover read the notice and understood from it that creditors would be notified if there was a need to file a proof of claim. (Tr. 39–40) Stover first became aware of the May 11, 1995 bar date by a November 6, 1995 letter to him from Scott Wetzel in which Scott Wetzel advised, in part, as follows:

> This correspondence is being forwarded at the direction of The Grand Union Company.
>
> \*      \*      \*      \*      \*      \*
>
> With respect to your claim, Grand Union Company records indicate that no Proof of Claim was filed in accordance with the [bar date] Order.
>
> \*      \*      \*      \*      \*      \*
>
> Accordingly, Scott Wetzel Services, Inc., on behalf of The Grand Union Company, advises that your claim has been discharged, and we are closing our file at this time.

(Doc. # 1087, Ex. B; Tr. 41–42)

When asked why he did not file a notice of appearance in the Chapter 11 case, Stover stated a number of reasons. First, he pointed out that he was not admitted to practice in

Delaware. (Tr. 40) Also, he relied upon the filing notice which advised that if there was a need to file a proof of claim, the claimants would receive notice to that effect. (Tr. 41) Finally, he relied upon the fact that he was working closely with Scott Wetzel to resolve the claim and he thought that it would be resolved through Scott Wetzel. (Tr. 42)

Sometime in late December 1995, Nayerahamadi was advised by Stover that her claim was barred for failure to file a proof of claim by the May 11, 1995 bar date. Nayerahamadi subsequently retained other counsel and on February 27, 1996, she filed her motion seeking authority to file a late proof of claim.

*Chris Economaki ("Economaki"):*

On December 29, 1993, Economaki sustained personal injuries on Grand Union's premises, allegedly as a result of Grand Union's negligence. Economaki retained counsel and that counsel was advised by Grand Union to deal with Scott Wetzel regarding the personal injury claim. By a January 31, 1994 letter, Economaki's counsel, Harry Norton ("Norton") of the firm of Evans and Hand of West Paterson, N.J., advised Scott Wetzel of Economaki's injuries and his claim against Grand Union. It is not clear whether Norton had any other prior communications with Grand Union or any of its agents, or exactly how it came about that Norton first communicated with Scott Wetzel regarding the claim. In any event, in the January 31, 1994 letter, Norton made it clear to Scott Wetzel that he was representing Economaki in a negligence claim. Norton advised Scott Wetzel that Economaki had undergone hospitalization and surgery, that further medical attention was needed and that at some point he would forward medical reports and records to Scott Wetzel with a view to resolving the claim. (Doc. # 943, Ex. A)

By a June 8, 1994 letter to Norton, Scott Wetzel acknowledged Norton's representation, acknowledged Norton's letter of May 31, 1994 and requested that Norton "provide the undersigned with a reasonable demand so that we can approach our client with same." (Doc. # 943, Ex. B) By an October 12, 1994 letter to Norton, Scott Wetzel "advised that we have been authorized to settle this matter for $65,000. Please discuss this

matter with your client and advise the undersigned of your decision." (Doc. # 943, Ex. C) By a January 18, 1995 letter to Scott Wetzel, Norton acknowledged the settlement offer letter of October 12, 1994, but rejected the offer. Norton pointed out that his client was still actively undergoing treatment and that settlement of the matter was therefore premature. Norton concluded his January 18, 1995 letter by stating "upon receipt of this letter please contact me and I would like to discuss with you where I think we are headed in this matter and the potential for resolving this short of the institution of suit." (Doc. # 943, Ex. D)

By a March 6, 1995 letter to Norton, Scott Wetzel advised that Grand Union had filed a Chapter 11 petition on January 25, 1995 and that the Bankruptcy Code automatically stayed further actions against the Debtors. The letter concluded by stating that "we regret our inability to be of service to you at this time." (Doc. # 943, Ex. E) Norton assumed that further communication regarding the personal injury claim, including any request for the filing of a proof of claim, would come to him from Scott Wetzel or Grand Union. (Tr. 14–15, 35)

It is not clear from the record when Economaki received the bar date notice, but it appears that on or about May 6, 1995, Economaki met with one of Norton's partners. Norton's partner and Economaki were lifelong friends and neighbors. It does not appear that this meeting was related to Economaki's claim against Grand Union. (Tr. 22) At that meeting, Economaki handed over to Norton's partner two documents attached together, the document on top being the March 23, 1995 notice of the filing of Grand Union's first amended plan of reorganization (a one-page document) and the document on the bottom being the bar date notice (a four page document). (Tr. 20–22) At the top of the first document is a handwritten notice stating "Harry—FYI, Chris E." (Doc. # 943, Ex. F) Norton identified this handwriting as Economaki's and interpreted the message as Economaki's delivery of the documents to Norton for his information. (Tr. 21) Apparently, the documents remained in Norton's partner's possession for a number of days without being delivered to Norton. Norton first saw the documents on May 16,

1995 when they appeared in his "in" box on his desk. Norton read the bar date notice and immediately realized that the time for filing a proof of claim had passed. (Tr. 20–29) While his practice does not involve bankruptcy work, Norton has had numerous occasions for filing proofs of claims in other bankruptcy cases. (Tr. 16–18)

Being aware that the last date for filing proofs of claims had already passed, Norton did not immediately undertake to pursue the filing of a late claim or seeking relief to do so. (Tr. 29–30) When he first became aware of the Grand Union bankruptcy, Norton put a note in his tickler file to check on the matter sometime in July. (Tr. 19) In any event, on or about July 7, 1995, Norton started the process of contacting attorneys with respect to the Grand Union bankruptcy to pursue the filing of a late claim. By an August 14, 1995 letter to the Clerk of the Court, one of Norton's associates in the firm forwarded Economaki's proof of claim. (Doc. # 943, Ex. G) On September 1, 1995, Scott Wetzel wrote to Norton advising, in part, as follows:

"This correspondence is being forwarded at the direction of The Grand Union Company.

\* \* \* \* \* \*

With respect to your claim, Grand Union Company records indicate that no Proof of Claim was filed in accordance with the [bar date] Order.

\* \* \* \* \* \*

Accordingly, Scott Wetzel Services, Inc., on behalf of The Grand Union Company, advises that your claim has been discharged, and we are closing our file at this time."

(Doc. # 943, Ex. H)

On November 22, 1995, Economaki filed his motion seeking leave to file a late proof of claim.

*Donna Jason ("Jason"):*

Jason sustained personal injuries on Grand Union's premises on October 24, 1994. After having some initial contact with a representative of Grand Union, Jason retained counsel and thereafter, had no further dealings with

Grand Union regarding her claim. (Tr. 97) Indeed, she testified that she specifically told Scott Wetzel that Grand Union should deal with her attorney. (Tr. 97) Jason's attorney, Ms. Gaetano Liantonio–McBride ("McBride") of the firm of Shaw, Licitra, Parente, Esernio and Schwartz, P.C. of Garden City, N.Y., immediately commenced a series of communications with Grand Union's agent, Scott Wetzel, regarding Jason's claim. By a November 9, 1994 letter from McBride to Scott Wetzel, McBride specifically advised that her firm had been retained by Jason and would be representing her in the personal injury claim. The letter advised that medical records would be forwarded shortly. (Doc. # 1003A, Ex. A) By a December 13, 1994 letter from McBride to Scott Wetzel, McBride authorized Scott Wetzel to obtain medical records from several specified doctors. (Doc. # 1003A, Ex. B) By a January 11, 1995 letter from McBride to Scott Wetzel, she furnished copies of Jason's medical records from two doctors. (Doc. # 1003A, Ex. C) By a May 25, 1995 letter from McBride to Scott Wetzel, McBride furnished additional medical records relating to Jason's condition. McBride also advised in that letter that further information regarding lost wages and unreimbursed medical expenses would be forwarded to Scott Wetzel. (Doc. # 1003A, Ex. D) McBride testified that she had extensive telephone discussions with Scott Wetzel in addition to the letter communications regarding Jason's condition and settlement discussions. (Tr. 100–3)

Jason testified that she never received any communications from Grand Union concerning the Grand Union bankruptcy case.[1] (Tr. 97) McBride testified that she received no communication from Scott Wetzel or from anyone else associated with Grand Union advising her that Grand Union had filed a Chapter 11 petition. (Tr. 104–6) Her first knowledge of Grand Union's bankruptcy came in the form of Scott Wetzel's standard notice letter regarding the effect of the bar date. Specifically, by an October 17, 1995 letter from Scott Wetzel to McBride, McBride was advised that:

> "This correspondence is being forwarded at the direction of The Grand Union Company.
>
> \* \* \* \* \* \*
>
> With respect to your claim, Grand Union Company records indicate that no Proof of Claim was filed in accordance with the [bar date] Order.
>
> \* \* \* \* \* \*
>
> Accordingly, Scott Wetzel Services, Inc., on behalf of The Grand Union Company, advises that your claim has been discharged, and we are closing our file at this time."

(Doc. # 1003A, Ex. E)[2]

When advised of the discharge of the claim, McBride consulted a bankruptcy attorney to obtain guidance in the matter. (Tr. 105) On December 13, 1995, on behalf of Jason, McBride filed a motion seeking authority to file a late proof of claim.

In none of the three situations did Scott Wetzel suggest to counsel representing the claimants a need to file a proof of claim. In none of the three situations is there any evidence that, after counsel began communicating with Scott Wetzel regarding the representation and prior to the filing of the

---

1. Grand Union did not have the correct mailing address of Jason. Grand Union's mailing list indicates Jason's address as "Forrest Drive Port Washington, NY 11050." (Doc. # 1199, Ex. A) The correct mailing address, however, should have been "Forrest Drive, Sands Point, New York 11050." (Doc. # 1117, ¶ 5)

   Grand Union, however, contends that its listing of the town in which Jason resides as "Port Washington" rather than "Sands Point" would not have prevented the Postal Service from delivering notices (including the bar date notice) to Jason since Port Washington and Sands Point have the same zip code (i.e., 11050) and since Sands Point is an area within Port Washington.

(Doc. # 1199, ¶ 12) Grand Union, in support of its contention, submitted an affidavit written by an acting manager of operations program support for the Triboro District of the United States Postal Service, which states that:

> "A mail item addressed to "Port Washington, New York 11050," bearing a street address in Sands Point, should be routed to the Port Washington Post Office and be delivered to the Sands Point address in the normal course."

(Doc. # 1922, Ex. C)

2. The substantive portions of three Scott Wetzel letters advising of the claim discharge are exactly the same.

petition, Grand Union or Scott Wetzel communicated directly with the claimants.

While the age, level of formal education and occupation of the three claimants are all different, the record does not suggest that any of them are experienced in sophisticated commercial matters or that they had any prior involvement with bankruptcy matters.

## DISCUSSION

■ The movants premise their right to file late proofs of claims on the "excusable neglect" provision of Rule 9006(b)(1), particularly as that provision has been articulated by the Supreme Court as requiring the application of a multi-factor equitable analysis.[3] *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395, 113 S.Ct. 1489, 1498, 123 L.Ed.2d 74 (1993). As to Economaki, who in fact received the bar date notice but did not effectively communicate it to his counsel, I believe the excusable neglect provision as interpreted by *Pioneer* would warrant the grant of his motion. However, as to the other two movants, who deny receipt of the bar date notice, I do not believe that the excusable neglect provision, even as liberalized by *Pioneer*, would warrant granting their motions. Excusable neglect is obviously premised on some acknowledged mistake or fault on the part of the movant. These two movants, however, do not acknowledge any mistake or default on their part since their asserted nonreceipt of the bar date notice did not require them to do anything. As Grand Union points out, it is a well established rule that the bar date notice is presumed to have been received by the creditor when, as here, the debtor offers proof that it was timely and properly mailed by the debtor. *See Williams v. Williams*, 185 B.R. 598, 599 (9th Cir. BAP 1995); *Trump Taj Mahal Assocs. v. Alibraham (In re Trump Taj Mahal Assocs.)*, 156 B.R. 928,

938–39 (Bankr.D.N.J.), *aff'd sub nom. Trump Taj Mahal Assocs. v. O'Hara (In re Trump Taj Mahal Assocs.)*, 1993 WL 534494 (D.N.J. 1993); *In re Schepps Food Stores, Inc.*, 152 B.R. 136, 139 (Bankr.S.D.Tex.1993). And the presumption is not rebutted by a mere denial of receipt by the creditor. *Greyhound Lines, Inc. v. Rogers (In re Eagle Bus. Mfg., Inc.)*, 62 F.3d 730, 735–36 (5th Cir.1995); *Moody v. Bucknum (In re Bucknum)*, 951 F.2d 204, 207 (9th Cir.1991); *CUNA Mutual Ins. Group v. Williams (In re Williams)*, 185 B.R. 598, 600 (9th Cir. BAP 1995); *Trump Taj Mahal*, 156 B.R. at 939. I do not read the *Pioneer* decision as suggesting a modification of these well established rules. Indeed, any modification of these rules might create serious procedural problems in large bankruptcy cases.[4]

■ However, the pre-petition involvement of the claimants' attorneys with Grand Union's agent, Scott Wetzel, raises an issue of the adequacy of the bar date notice and it is that issue to which I now direct my attention. *Cf. R.H. Macy & Co.*, 161 B.R. 355, 357 (Bankr.S.D.N.Y.1993) (noting that excusable neglect exception "presupposes that the creditor received timely and adequate notice of the proceedings"). Although the movants are seeking to file late proofs of claim under the rubrick of excusable neglect and although that provision may implicate certain inadequacy characteristics in the notice, as discussed below, inadequate notice of the bar date, in and of itself, is a separate ground upon which a late proof of claim is allowed to be filed.

The issue before me is whether Grand Union, a Chapter 11 reorganizing debtor, has a duty to furnish the claimants' attorneys with the bar date notice where Grand Union, prior to its commencement of the case, had

---

**3.** Rule 9006(b)(1) provides:

Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) *on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.*

Rule 9006(b)(1) (emphasis added).

**4.** Of course, the presumption is rebuttable. If, for example, a movant were able to demonstrate that during the time the bar date notice was mailed out, he experienced other instances of nonreceipt of properly addressed mail, then the presumption could be rebutted.

specific knowledge of the claimants' representation in pursuing their personal injury claims against it and there had been a series of pre-petition communications between Grand Union's agent and the claimants' attorneys exploring possible resolutions of the claims.

The Fifth Amendment mandates that no person shall be deprived of property "without due process of law." Although "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause," as the Supreme Court observed, "there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950).

■■■ The property right at issue before me is the movants' right (assuming, but for the late filing, they have allowable claims) to participate in the distribution scheme under the Grand Union's plan of reorganization. Any creditor whose claim is not scheduled or is listed as disputed, contingent or unliquidated is required to file a proof of claim before a bar date established by the bankruptcy court. *See* Rule 3003(c). One who fails to file a timely proof of claim "shall not be treated as a creditor with respect to such claim for the purpose of voting and distribution." *See* Rule 3003(c)(2). Therefore, holders of disputed, contingent or unliquidated claims, such as the movants in this case, who fail to timely file a proof of claim, are not entitled to participate in the debtor's reorganization and are not entitled to receive a distribution and their claim is discharged. *See* 11 U.S.C. § 502(a)[5]; § 1141(d); Rule 3003(c)(2). In short, the claims bar date operates as a federally created statute of limitations, after which the claimant loses all of her right to bring an action against the debtor. *See Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 96 F.3d 687, 690 (3d Cir.1996) (noting that bar date means "a 'drop-dead date' that bars all prepetition claimants who received the required notice").

■■■ However, inadequate notice of the claims bar date is a defect which precludes discharge of a claim in bankruptcy. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir.1995). A claimant, who is not apprised with reasonable notice of the bar date, is not bound by the legal effects of the confirmation of the plan and should be allowed to file a late proof of claim. *See Greyhound Lines, Inc. v. Rogers (Eagle Bus. Mfg., Inc.)*, 62 F.3d 730, 735 (5th Cir.1995); *Spring Valley Farms, Inc. v. Crow (In re Spring Valley Farms, Inc.)*, 863 F.2d 832, 834–35 (11th Cir.1989). *See also Atlantic Richfield Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 110 B.R. 205, 207–08 (Bankr.W.D.Pa.1990) (holding that courts have traditionally allowed creditors to file late proofs of claims notwithstanding their failure to timely file the claims where they were not provided with reasonable notice of bar date).

■■■ Whether a creditor received adequate notice of a bar date "depends upon the facts and circumstances of a given case." *See Oppenheim, Appel, Dixon & Co. v. Bullock (In re Robintech, Inc.)*, 863 F.2d 393, 396 (5th Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 55, 107 L.Ed.2d 24 (1989). In general, due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).[6] In other words, the notice must be such that it would reasonably inform the interested parties that the matter is pending and would reasonably allow the parties to "choose for [themselves] whether to appear or default, acquiesce or contest." *See Mullane*, 339 U.S. at 314, 70 S.Ct. at 657.

5. Reference to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* are hereinafter cited as "§ _____."

6. "Although *Mullane* involved the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases." *Chemetron Corp.*, 72 F.3d at 346.

■ Grand Union contends that the claimants were provided with adequate notice of the bar date since it timely mailed the bar date notice to the claimants. According to Grand Union, an actual written notice to the claimants is all that is required by the *Mullane* standard. Particularly, Grand Union, citing Rule 2002(g), argues that it had no duty to send the bar date notice to the attorneys known to be representing the movants.[7] I disagree with Grand Union's contention since I conclude that under the circumstances here, the direct mailing of the bar date notice to the movants did not satisfy the due process requirement of adequate notice. Even if we assume that the bar date notice was timely received by each movant, for the reasons discussed below, I find that Grand Union's direct mailing of the notice to the movants was not "reasonably calculated . . . to apprise" the movants of the claims bar date and of its significance. *See id.* Like publication of a bar date notice is inadequate notice to a known creditor, *see Chemetron,* 72 F.2d at 346, I believe that, under the facts here, mailing of the bar date notice to a personal injury claimant whose exclusive representation by counsel is specifically known by the debtor is equally inadequate.

It is reasonable to expect that the movants, unsophisticated claimants, upon receipt of the bar date notice, paid no attention to the notice since they could have easily believed that the same notice would have been sent to and received by their counsel. Here, we have three lay-persons who allegedly sustained personal injuries on the premises of Grand Union. Subsequently, the claimants retained counsel to pursue their legal remedies against Grand Union. The sole purpose of their retentions was to obtain full legal guidance in effectively resolving their claims. Counsel were fully empowered to, and expected to, be communicating with Grand Union, or its agent, Scott Wetzel, on behalf of the claimants. It was counsels' task to negotiate with Grand Union, or its agent, for an agreeable resolution and to institute an action if no resolution would have been forthcoming.

Upon their retention, counsel did what they were hired to do. They timely contacted Scott Wetzel, Grand Union's agent, informed it of their representation and established a line of communication with Grand Union. From the first letters to Scott Wetzel and up until the commencement of Grand Union's Chapter 11 case, there had been active communications between Scott Wetzel and the movants' attorneys, exchanging numerous written correspondences and attempting to resolve the claims short of litigation. Equally important, during that period, there was no communication between the individual claimants and Grand Union, or its agent, Scott Wetzel.

Had there been no bankruptcy filing by Grand Union, Scott Wetzel would have been continuously and exclusively communicating with the movants' attorneys for "an amicable conclusion." If no resolution would have been reached, presumably the movants' attorneys would have commenced personal injury actions against Grand Union in state courts.[8] Either way, once counsel's representation was known to Scott Wetzel, there would have been no reason for either Grand Union or Scott Wetzel to initiate a direct communication with the claimants. Likewise, there would have been no reason for the claimants to expect any communication from Grand Union or Scott Wetzel.

Here, however, Grand Union did file a Chapter 11 petition. Grand Union did communicate directly with the claimants when it sent notices regarding its bankruptcy case to them, including the bar date notice. The commencement of bankruptcy case, however,

---

7. Rule 2002(g) provides:

All notices required to be mailed under this rule to a creditor, equity security holder, or indenture trustee shall be addressed as such entity or an authorized agent may direct in a filed request; otherwise, to the address shown in the list of creditors or the schedule whichever is filed later.

Rule 2002(g).

8. Presumably, the applicable statute of limitations for personal injury actions is two or three years, which is substantially more than the less than 30 days effected by the bar date notice. The bar date notice, which was dated April 6, 1995, stated that a proof of claim must be received by Grand Union on or before 5:00 p.m. Eastern Daylight Savings Time on May 11, 1995. It was not mailed out by Grand Union until April 11, 1995.

did not change the claimants' justifiable expectation that Grand Union would be communicating with the claimants' lawyers. For them, it was safe to believe that any notice they received, such as the bar date notice, would have been sent to and received by their counsel simultaneously since Grand Union was expected (indeed, instructed) to be communicating with their counsel. Consequently, the movants were entitled to pay little or no attention to the bar date notice sent to them by Grand Union.

Even if we assume that they read the bar date notice, the movants would have been hard pressed to determine what action, if any, should be taken with regard to the notice. The bar date notice, a four page, over 1,000 word document, couched with legalese, is a complex legal document, and clearly is not easily comprehensible by a layperson.

Moreover, it is not easily determinable from the notice itself whether the notice applies to these claimants. The title of the notice states that it only applies to "certain" claims. The notice specifies numerous exceptions, in which case no action was required at all. Most notably, one of the nine exceptions enumerated in the notice applies to:

> [c]laims listed in the Debtor's schedules of liabilities filed with [this] Court (the "Schedules") or any amendments thereto which are not therein listed as "contingent," "unliquidated" or "disputed" *and* which are not disputed by the holders thereof as to amount or classification.

(Doc. # 1017, Ex. A, ¶ (xi)) (emphasis original). I believe this exception is incomprehensible by a lay-person without the assistance of someone who possesses, or has the ability to possess, a working knowledge of the Bankruptcy Code. Moreover, it requires the claimants to go to the offices of Grand Union's attorneys to check the schedules filed by Grand Union in order to determine whether their claims are listed as "contingent," "unliquidated" or "disputed" and whether the amount and classification listed in the schedules are agreeable to the claimants.

The movants are lay-persons, and unlike commercial creditors, presumably had never been involved in a commercial bankruptcy proceeding. It is unreasonable to suggest that these movants, who presumably had never seen a bar date notice before, would fully appreciate the meaning and legal significance of the notice and react accordingly. It is equally unreasonable to expect that they would travel to the offices of Grand Union's counsel, check the schedules, see whether their claims are correctly listed, and determine what action, if any, needs to be followed. I would think that an experienced non-bankruptcy lawyer receiving such a bar date notice would take the easy course of action by simply filing a proof of claim and not worry about figuring out the distinctions made in the notice. In this regard, I note that Jason's attorney, a general practitioner, testified that she did not even know what a bankruptcy bar date notice was. (Tr. 105)

Furthermore, the movants could have concluded that they were exempted from filing since they reasonably could have believed that their claims were undisputed, liquidated and not contingent. Here we have three individual claimants, who were previously informed by their counsel that Grand Union, through its agent Scott Wetzel, had acknowledged their personal injury claims. As far as they were informed by their counsel, (1) Grand Union had agreed to try to resolve their claims, (2) there was no immediate concern to bring an action against Grand Union since Grand Union would prefer an out-of-court settlement, and, (3) in any event, they had more than enough time to sue Grand Union since the applicable state statute of limitations had not run. Where Grand Union knew of their claims and agreed to try to resolve their claims, the movants could have fairly believed that their claims were undisputed, liquidated and not contingent.

In summary, assuming the bar date notice was timely received by the movants, it was highly unlikely that the movants would have paid any attention to the notice. Even if they read the notice, without understanding its exigent nature, it was unreasonable to expect them to react properly. Moreover, where it was reasonable for the movants to expect that the same notice would have been sent to their counsel as well, it was reasonable for them to not act on it.

These difficulties could have been easily obviated by Grand Union. Grand Union, through its agent Scott Wetzel, had specific knowledge (a) that these three claimants were represented by counsel and (b) that these three claimants desired that Grand Union or its agent deal with their claims through the identified counsel. During the pre-petition period, Grand Union honored the claimants' requests by (a) having all communications regarding the claims only between its agent, Scott Wetzel, and the attorneys representing the claimants and (b) having no communications between itself, or its agent, and the claimants regarding their claims. However, after the filing of the petition, Grand Union proceeded to communicate with the claimants and not with the lawyers, including the critical communication of the bar date notice. Once the bar date had passed and Grand Union's records reflected that these claimants failed to file proofs of claims, Grand Union then caused Scott Wetzel to advise the claimants that their claims had been discharged. But, ironically, while Grand Union had sent the bar date notice to the claimants, it had Scott Wetzel notify all the claimants' counsel of the discharge of the claims. Thus, the record shows that Grand Union could have easily sent the bar date notice to the movants' counsel as it communicated, through Scott Wetzel, in pre-petition and post-confirmation periods. Given the import of the bar date notice, it would be grossly unfair and inequitable to leave the movants' counsel uninformed on such a matter when their representation was clearly known to Grand Union. At the same time, it would be equally improper to incumber these claimants with grave responsibilities of reading, understanding and conveying the message to their counsel. Under the circumstances here, sending the bar date notice to the claimants amounted to a trap for the unwary.[9]

Sending the notice to the claimants, in and of itself, was not reasonably calculated to apprise the claimant of the bar date. The bar date notice directly sent to the claimants could not have reasonably apprised them of their rights and obligations in this bankrupt-

cy case. In order to provide the claimants with adequate notice of the bar date, Grand Union should have notified their counsel directly. This could have been effected by Grand Union listing the claimants by the names and addresses of their attorneys on its list of creditors. Absent a bar date notice sent to their counsel, I conclude that the movants did not receive adequate notice of the bar date so as to permit them to file their proofs of claims in a timely manner.

Grand Union argues that sending the notice to counsel is not required absent the entry of an appearance by counsel as contemplated by Rule 2002(g). That Rule provides, in pertinent part, that:

> All notices required to be mailed under this rule to a creditor ... shall be addressed as such entity or an authorized agent may direct in a filed request; otherwise, to the address shown in the list of creditors or the schedule whichever is filed later.

Rule 2002(g).

■ According to Grand Union, Rule 2002(g) requires a debtor to send all notices to a creditor's agent (such as counsel) only where the debtor is directed to do so "in a filed request." I believe the "in a filed request" language of Rule 2002(g) should be broadly construed to encompass the present situation, in which an attorney representing a personal injury claimant, in a pre-petition written notice, has requested Grand Union or, its claims adjuster, to communicate with the attorney exclusively regarding the claim. I do not believe Rule 2002(g) should be construed so narrowly as to impose on the debtor a duty to send the bar date notice to the movants' counsel only if counsel files a formal request in the bankruptcy case.

■ Furthermore, Rule 2002(g) provides that the mailing will otherwise be "to the address shown in the list of creditors or the schedule whichever is filed later." The issue then becomes whether, notwithstanding Grand Union's knowledge that the claimants were represented by counsel and notwithstanding its pre-petition and post-confirma-

---

9. Even an attorney with no experience in bankruptcy matters, after receiving this type of bar date notice and then wading into the Bankruptcy Code and the Bankruptcy Rules, would most surely be challenged in discharging his or her professional responsibilities.

tion communications exclusively conducted with the claimants' counsel, Grand Union is entitled to simply list the claimants by the claimants' addresses. Under the rationale of *Mullane* and for the reasons discussed above, I find that Grand Union's creditor list should have identified the three claimants by reference to their attorneys.

In addressing the question of whether notice to a claimant's lawyer alone is adequate notice to the claimant, the court in *Linder v. Trump's Castle Assocs.*, 155 B.R. 102 (D.N.J. 1993) makes a point which I believe supports the position I take here. In *Linder*, the court addressed the issue of whether a late filed claim should be permitted under the excusable neglect provision where the attorney to whom bar date notice was sent denied receiving the notice. In discussing the preliminary issue of whether notice served on the lawyer retained by a plaintiff in a personal injury action could be fairly imputed to the client, the court made the following observation regarding service on the attorney known to represent the claimant.

> Some courts have held that notice to the attorney binds the client only when given in the context of his or her representation of the client in the bankruptcy case itself. *See Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985) (citing 3 L. King, *Collier on Bankruptcy* § 523.13 (15th ed. 1984)). *See also In re Yoder Co.*, 758 F.2d 1114, 1117 n. 1 (6th Cir.1985). However, both *Maldonado* and the treatise conclude, and we agree, that ordinarily notice to the attorney can be imputed to the client if the attorney is representing the client regarding a claim against the debtor. Because [the attorney] was representing [the claimant] in her claim against respondent at the time the notice was mailed, we concur with the bankruptcy court that if notice was properly served upon [the attorney] it may fairly be imputed to [the claimant].

*Id.* at 105 (footnote omitted).

In a footnote to this discussion, the court makes the following observation regarding the practical advantage of giving notice to counsel rather than the claimant:

> Debtors who are defending large numbers of law suits have routinely dealt with plaintiffs' counsel, and there would be practical problems in imposing a rule which invalidated notices mailed to those attorneys rather than directly to the plaintiffs. *Indeed, one could anticipate more late filing disputes if notices of a bar date were mailed directly to the plaintiff rather than to his attorney.*

*Id.* at 105 n. 3 (emphasis added).

■ I also find that Grand Union's conduct in sending the bar date notice directly to the claimants violates the spirit, if not the letter, of Rule 4.2 of the Model Rules of Professional Conduct.[10] The commentary to the Model Rules of Professional Conduct as published by the American Bar Association states the purpose of the anti-contact rule to be as follows:

> The purpose of Rule 4.2 is to prevent lawyers from taking advantage of uncounselled lay persons and to preserve the integrity of the lawyer-client relationship. See *United States v. Batchelor*, 484 F.Supp. 812 (E.D.Pa.1980) (societal interest that lay persons not make decisions of major legal implication without advice of counsel); *Frey v. Department of Health and Human Servs.*, 106 F.R.D. 32 (E.D.N.Y.1985) (noting courts and commentators have stated that provision is meant to prevent situations in which adverse counsel would take advantage of represented party); *Carter v. Kamaras*, 430 A.2d 1058 (R.I.1981) (preserves proper functioning of judicial system); *Wright v. Group Health Hosp.*, 103 Wash.2d 192, 691 P.2d 564, 50 A.L.R.4th 641 (1984) ("presence of the party's attorney theoretically neutralizes the contact" by opposing party's attorney); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 83–1498 (1983) (prohibition is necessary to preserve the proper functioning of attor-

---

10. Rule 4.2 of the Model Rules of Professional Conduct of the American Bar Association, applicable in this jurisdiction pursuant to D.Del. LR 83.6(d)(2), provides as follows:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

ney-client relationship and to shield party from improper approaches). . . .

Annotated Model Rules of Professional Conduct Rule 4.2 cmt. (1992).

While the bar date notice in this case contains some ambiguity as to whose communication it is, I believe that it is fairly viewed as a communication from Grand Union's counsel. Pursuant to an appropriate application, I signed the bar date order on April 6, 1995. Included in the bar date order is a provision which requires the Debtor to serve the "notice," a form of which notice was attached to the application. The form of notice attached to the application concludes with a "by order of the court" statement with a signature line for the bankruptcy judge. Below the signature line for the bankruptcy judge is the identification of Grand Union's counsel with Grand Union's counsel's conformed signature on a signature line. The signature line for the court on the form of notice attached to the application is blank.

The actual bar date notice that was sent out shows on the judge's signature line a conformed signature, and shows the conformed signature of counsel for Grand Union. Although the bar date notice was issued pursuant to this court's order and although it shows, for reasons unknown to me, my conformed signature, for all intents and purposes, I consider the mailing of the notice to the claimants as a communication by Grand Union's counsel to the claimants. It was Grand Union's counsel who (1) drafted and prepared the bar date notice, (2) submitted the notice to and obtained an approval from this court for its issuance, (3) caused the notice to be mailed to the movants, and (4) appended their name and conformed signature at the end of the notice as thereby acknowledging authorship of the notice.

I find that the bar date notice is the type of attorney communication contemplated by Rule 4.2 of the Model Rules of Professional Conduct and, consequently, it should have been communicated to the claimants' counsel, not to the claimants.

While not a bankruptcy case, I find the decision in *Graham v. United States*, 96 F.3d 446 (9th Cir.1996) instructive on the matter before me. In *Graham*, the court in construing a federal regulation (which prescribed notice requirements for denial of an administrative claim filed with a federal agency pursuant to the Federal Tort Claims Act ("FTCA")) held that where the agency knows the claimant is represented, it has an obligation to notify the claimant's counsel of the denial of the claim even though the language of the regulation did not require the agency to do so. *Id.* at 448. In *Graham*, an administrative claimant (a federal prisoner) was injured while incarcerated. Subsequently, she retained counsel and filed an administrative claim with an appropriate agency pursuant to the FTCA. The evidence clearly showed that the agency knew that she was represented by counsel and that there were numerous correspondences between the agency and her counsel "clearly contemplat[ing] that the agency would notify counsel of important developments in the case." *Id.* at 447.

However, when the agency rendered its decision denying the claim, it "inadvertently" failed to notify the claimant's counsel. *Id.* at 448. Rather, it sent the denial notice directly to the claimant. The claimant, not realizing the import of the notice, threw it away. *Id.* at 447.

In *Graham*, like the matter before me, the adequacy of the notice was a controlling issue because under FTCA, the claimant had six months from the date of mailing of the denial notice to institute an action against the United States in a district court. In other words, mailing of a denial notice triggered a six month statute of limitations. A regulation implementing the FTCA, prescribed by the Department of Justice, provided that

a final denial of an administrative claim *shall be* in writing and *sent to the "claimant, his attorney, or legal representative* by certified or registered mail."

*Id.* at 448 (emphasis added).

The claimant's counsel, like the movants' counsel here, never received a notice of denial and untimely instituted an action against the United States. The government moved to dismiss the complaint as untimely, arguing that the claim was forever barred under the FTCA. The claimant opposed the motion, contending that "the mailing of the notice of denial to her was ineffective to trigger the

six month statute of limitations because the [agency] should have sent it to her counsel, as required by the regulation." *Id.* The district court dismissed the action, agreeing with the government's position that "the regulation authorized the notice of denial to be sent to [the claimant] and that the mailing therefore triggered the statute of limitations." *Id.*

The Court of Appeals, reversing the district court's dismissal, first noted that "interpreting the regulation to authorize [the agency] to mail the notice of denial to the claimant in every case detracts from the purpose of the statute: to ensure that notice is given in a manner that effectively triggers the time for filing a court action." *Id.* at 448. It went on to hold that where the agency knows the claimant is represented, the regulation should be interpreted as directing the agency to mail the notice of denial to that attorney or legal representatives "because that is the person who is usually responsible for preparing and filing the court action." *Id.* at 448. In so holding, the court effectively disregarded the disjunctive language of the regulation. The court reasoned that:

> Authorizing direct contact with the claimant contradicts prevailing ethical standards that require dealings with counsel where an opposing party is known to be represented, unless counsel consents or the communication is authorized by law. The ethical rule is meant "to prevent lawyers from taking advantage of uncounselled lay persons and to preserve the integrity of the lawyer-client relationship."

These standards are well known to the Department of Justice, the agency that promulgated the regulation and the defendant in this action.... In promulgating those regulations, the Attorney General observed that disciplinary authorities in all 50 states and the District of Columbia have adopted standards to prevent opposing counsel from contacting represented persons.... The rule is designed to shield opposing parties not only from an attorney's approaches which are intentionally improper, but from approaches which are well-intended but misguided.

*Id.* at 449 (citations omitted).

I believe that Rule 2002(g), like the regulation at issue in *Graham*, should be interpreted in accordance with the "prevailing ethical standards that require dealings with counsel where an opposing party is known to be represented." *See id.* at 449. Accordingly, Rule 2002(g) should not be construed as to allow a Chapter 11 debtor to send its bar date notice to a personal injury claimant if the claimant's legal representation is known to the debtor.[11]

In one reported decision, a bankruptcy court required the debtor to include in its schedules the name and address of the attorney representing one of its creditors. *See In re Williams*, 51 B.R. 627, 629 (Bankr. S.D.Ohio 1985). In *Williams*, the court held that where counsel for debtor knows that its creditor has been represented by counsel, the debtor has a duty to include the name and address of the creditor's counsel in its schedules and list of the creditors for the purpose of notifying the creditor. *Id.* at 629. In that case, a bank, which failed to attend the § 341 meeting and the confirmation hearing, moved to vacate the order of confirmation, arguing that its counsel did not receive the notice of the first meeting of creditors or of the confirmation hearing. In support of its motion, the bank showed that (1) at and prior to the filing of the case, the debtor's counsel "had been in touch with and had been dealing with" the bank's counsel, "knowing during such contacts that [he] was acting as counsel" for the bank; (2) the name of the bank's counsel "appeared on the [mailing] matrix" prepared by the debtor; (3) the court's examination of its file in the case "revealed a business card" of the bank's counsel; and (4) the bank's counsel had appeared before the court, "requesting emergency relief" on behalf of the bank early in the case. *Id.* at 628.

---

11. Given my view that pursuant to Rule 2002(g), Grand Union should have listed the subject claimants by reference to their counsel, I do not believe that Rule 9010(b) has any bearing here. Pursuant to Rule 9010(b), "[a]n attorney appearing for a party in a case under the Code shall file a notice of appearance with the attorney's name, office address and telephone number, unless the attorney's appearance is otherwise noted in the record." By having the attorney listed in the list of creditors, that attorney's appearance would thereby otherwise be noted in the record.

The bank in *Williams* argued that in light of these facts, its counsel should have been notified of those hearings. The court, agreeing with the bank's contention, held that

> [t]here is no affirmative duty on the part of a debtor or his counsel to ascertain whether a creditor is represented by an attorney for purposes of assuring proper notice to creditors. It is only in the unusual situation before us where the fact of representation, and the identity of the attorney, were known to the debtor and/or his attorney that inclusion of the name and address of the attorney in conjunction with the identity of the creditor must appear in the bankruptcy schedules.

*Id.* at 629. The court reasoned that

> [i]t is fundamental, and a matter known to all attorneys, that where an attorney knows that a party is represented by counsel, he has a duty to deal with that party only through the attorney. It is undisputed here that counsel for debtors had actual knowledge that [the bank] was represented by [an attorney], for he had been dealing with [the bank's attorney] prior to the bankruptcy filing and in the course of those dealings [the attorney] was representing [the bank]. On those facts, the duty to include [the bank's attorney's] name in the bankruptcy schedules arose.

*Id.*

Although in *Williams,* the debtor's bankruptcy counsel had multiple sources of knowledge of the bank's representation and, thus, one could argue that it is distinguishable from the facts before me, I find that Grand Union had the same duty to include the names and addresses of the attorneys in conjunction with the identity of the claimants listed in the schedules because (a) it had specific knowledge of the representations, (b) it was advised by counsel to deal directly with him (her) and not the clients, and (c) all pre-petition communications were between Grand Union's agent and counsel, and none were between Grand Union (or its agent) and the claimants.

There are other reported decisions contrary to *Williams.* For the reasons discussed below, I respectfully decline to follow them.

In *In re Solvation, Inc.,* 48 B.R. 670 (Bankr.D.Mass.1985), the court found that an accounting firm, which timely received a bar date notice, was apprised with adequate notice of the bar date even though the debtor could have easily sent the bar date notice to counsel representing the firm. In *Solvation,* prior to the commencement of the Chapter 11 case, the debtor and the accounting firm had been adversaries to an action pending in California. *Id.* at 671. The record showed that the debtor knew of the accounting firm's representation and that the debtor could have easily sent the bar date notice to the firm's counsel. *Id.* at 672. The debtor, however, went the bar date notice directly to the firm, whose address was listed on the debtor's list of creditors and schedules filed with its Chapter 11 petition. *Id.* at 671–72.

Denying the accounting firm's motion to file a late proof of claim, the court held that the firm failed to show any proof of excusable neglect. *See id.* at 672–73. The court also held that the firm was apprised with adequate notice of the bar date. *See id.* at 673. In so holding, the court disagreed with the firm's proposition that "where a creditor has received notice but its attorney has not, the bankruptcy court can exercise its equitable power and extend the filing date for claims." *See id.* at 674. The court noted that the accounting firm's proposition would have been clearly warranted under Rule 2002(j) if the firm was "a government agency and its attorney [was] the United States attorney." *See id.* Since the firm was not a government agency, the court held that Rule 2002(j) had "no application to the firm's claim, ... leaving [the firm] without a basis for its request for a filing extension." [12]

Similarly, in *Dependable Ins. Co. v. Horton (In re Horton),* 149 B.R. 49 (Bankr.S.D.N.Y. 1992), the court held that a Chapter 7 debtor had no obligation to send notice of the com-

---

**12.** I am struck by the irony of Rule 2002(j), which requires notice be given to the federal government's attorney whenever a federal agency is a known claimant without regard to the debtor's knowledge of the attorney's involvement on behalf of the claimant, whereas, Grand Union's reading of Rule 2002(g) does not require notice to an attorney with whom it had exclusive pre-petition dealings on behalf of an individual claimant and without regard to the nature of the claim, or the level of the claimant's commercial or legal experience.

mencement of the case to counsel representing its creditor even though the debtor knew of such representation. In *Horton*, an insurance company, prior to the debtor's commencement of the bankruptcy case, had instituted an indemnity action against the debtor in another district. *Id.* at 51. While this indemnity action was pending, the debtor commenced its bankruptcy case. *Id.* at 52. Although the debtor knew counsel representing the insurance company in the indemnity action, the debtor did not send notice of the commencement of the case to the attorney. Instead, the notice was sent to the insurance company. *Id.* at 53.

The court, in dismissing the insurance company's untimely filed nondischargeability complaint, found that the company was apprised with sufficient notice of the bankruptcy case pursuant to Rule 2002 and such a notice was constitutionally adequate. *See Id.* at 59–60. Moreover, the court declined to follow the court in *Williams*, distinguishing the case before it as "a simple case in which a creditor mishandled a notice from this court." *See Horton*, 149 B.R. at 59. The court, in describing the *Williams'* ruling as "extraordinary relief" derived from "unusual circumstances," concluded that the case before it did not contain facts that warranted the relief granted in *Williams*. *See Horton*, 149 B.R. at 59. Most notably, the court distinguished its case from *Williams* by noting that unlike the debtor in *Williams*, "neither the debtor nor his bankruptcy counsel dealt with the [plaintiff's attorneys] in connection with his bankruptcy." *See Horton*, 149 B.R. at 59.

Recently, another bankruptcy court has noted its disagreement with the court in *Williams*. In *Midlantic National Bank v. Kouterick (In re Kouterick)*, 161 B.R. 755 (Bankr.D.N.J.1993), the court, in dicta, concluded that a debtor does not have a legal obligation to list counsel for creditors in its bankruptcy schedules or list of creditors for notice purposes even if the debtor knows that its creditors have been represented by counsel. *Id.* at 759. In *Kouterick*, although the debtors knew that one of their home mortgagees (a bank) had been represented by a law firm during their prior Chapter 7 case and that the same firm continuously represented the bank in a subsequent foreclosure

action brought by the bank against the debtors, when they commenced their Chapter 13 case, the debtors only notified the bank of their new filing. *Id.* at 756. The bank failed to make any objection to the debtors' plan, which proposed to cram down the bank's mortgage to zero. *Id.* at 756–57. After the plan was confirmed, the bank brought an adversary proceeding against the debtors, seeking a revocation of the order of confirmation "on the grounds that the debtors obtained it by fraudulently understating the value of the [mortgaged home]." *Id.* at 757. The bank further argued that the debtors' plan was confirmed "behind the back" of its counsel since the debtors failed to list the law firm on their schedules, and consequently, the court failed to send the law firm any appropriate notices. *Id.*

In *Kouterick*, although the court concluded that the bank's contention of the debtors' fraudulent misconduct was without merit, it went on to examine the bank's argument that the debtors had an obligation to list the law firm in their schedules. The court noted that the court in *Williams* had recognized that "where a debtor knows that a creditor is represented by an attorney, and knows the identity of the attorney, the debtor has a duty to include the attorney's name in the schedules of creditors for notice purposes." *See Kouterick*, 161 B.R. at 758. The court however declined to follow *Williams*, noting that it was unable to locate any rule authority for the *Williams* court's conclusion. *See Kouterick*, 161 B.R. at 758. The court further noted that "the only safe way to ensure proper service of notices is to serve the creditor directly" since "one cannot serve initial process on an attorney for a party unless the attorney agrees to accept service after authorization from the party." *Id.* at 759. According to the court, it does not necessarily follow that because the law firm represented the bank in a prior chapter 7 case and foreclosure action, the firm would "automatically be representing the client in subsequent cases regarding the same issues." *Id.* The court, however, noted that "it is certainly a desirable courtesy to list an attorney who is known to have represented a creditor in prepetition matters regarding the debt in question, in addition to scheduling the creditor separately." *Id.*

I decline to follow these three reported decisions for a simple reason: the claimants before me, unlike those in *Solvation, Horton* and *Kouterick,* are not sophisticated creditors who should have known about the consequences of the bankruptcy proceeding and a bar date notice. In *Solvation* the claimant was an accounting firm, in *Horton* it was an insurance company, and in *Kouterick* it was a bank. The accounting firm in *Solvation* should have known that once the debtor filed a bankruptcy petition, it needed to protect its claim against the debtor. As the court indicated, at least, the firm was sophisticated enough to "take reasonable steps prior to the bar date to insure that all confusion had been clarified and that is [sic] rights had been preserved." *See Solvation,* 48 B.R. at 674. Likewise, the insurance company in *Horton* was or should have been in a position to know that once the debtor (the company's potential judgment debtor) filed a Chapter 7 case, the company should look into possible grounds for which it could raise a nondischargeability of debt claim and if there was any, it should have raised it on time. According to the *Horton* court, the failure for the insurance company to file the complaint timely was solely attributable to the company's "own mishandling of the Notice." *See Horton,* 149 B.R. at 60. Similarly, in *Kouterick,* even if we assume that the bank's counsel had no knowledge of the debtors' new Chapter 13 case, the bank was in a position to fully understand the significance and consequence of the debtors' plan, which proposed to cram down its mortgage to zero. I find these factual differences significant and conclude that the claimants before me are entitled to greater protection under the Bankruptcy Code than the sophisticated creditors in the above discussed cases. I believe there is an important distinction to be made between lenders and trade creditors on the one hand and individuals whose claims

arise not out of the ordinary course business. For the former, dealing with bankruptcy matters is a part of their business. For the latter, the intervention of a bankruptcy case is typically a new and intimidating experience, which requires the assistance of counsel without imposing on the individual the decision of how and when counsel should be involved in the process.

I note one reported bankruptcy court decision that appears to be squarely in opposition with my conclusion. The court in *In re R.H. Macy & Co.,* 161 B.R. 355 (Bankr.S.D.N.Y. 1993) held that unless counsel representing creditors file notice with the bankruptcy court requesting the debtor to send all notices directly to them, the debtor has no obligation to send the bar date notice to the creditors' counsel under the Rule 2002(g) and the debtor's direct mailing of the bar date notice to the creditors constitutes adequate notice. *Id.* at 360. In *R.H. Macy,* four individual claimants, who allegedly held unliquidated and contingent personal injury or property damage claims against the debtors, sought authority to file late proofs of claims. *Id.* at 358. It appears that prior to the filing of their chapter 11 petitions, the debtors' counsel or its insurance carriers had been communicating with at least three claimants' counsel in settlement discussions or in proceedings involving adjudication of those claims. *See Id.* at 362.

The court, citing *Solvation* and *Horton,* concluded that the debtors' direct mailing of the bar date notice to those claimants was adequate notice. *See R.H. Macy,* 161 B.R. at 360. The court further held that Rule 2002(g) did not require the debtors to send the bar date notice to the attorneys since none of them filed a request regarding mailings with "the Bankruptcy Court." *See id.* In so doing, the court construed the Rule 2002(g) as requiring a creditor's counsel to file the request with the bankruptcy court in order to be entitled to notices. *See id.*[13]

---

13. There are other reported decisions that purport to hold that the debtor has no obligation to send notices to attorneys known to represent its creditors unless the attorneys entered an appearance in the bankruptcy case. *In re Alexander's Inc.,* 176 B.R. 715 (Bankr.S.D.N.Y.1995); *In re Friel,* 162 B.R. 645 (Bankr.D.N.J.1994); *Trump Taj Mahal Assocs. v. Alibraham (In re Trump Taj Mahal Assocs.),* 156 B.R. 928 (Bankr.D.N.J.),

*aff'd sub nom. Trump Taj Mahal Assocs. v. O'Hara (In re Trump Taj Mahal Assocs.),* 1993 WL 534494 (D.N.J.1993); *In re Nutri\*Bevco, Inc.,* 117 B.R. 771 (Bankr.S.D.N.Y.1990); *In re AMWC, Inc.,* 109 B.R. 210 (Bankr.N.D.Tex.1989); *In re Jackson,* 98 B.R. 738 (Bankr.D.Md.1986). I believe that these cases are not persuasive authority in deciding the subject motions because

Although *R.H. Macy* appears to be factually similar to the present case, with all due deference to the opinion's author, I decline to follow. As my discussion of *Solvation* and *Horton* shows, the precedents cited by the court in *R.H. Macy* are clearly distinguishable from the instant case. Moreover, as previously discussed, it is my view that under the circumstances here, Rule 2002(g) should be construed as requiring the bar date notice be sent to the claimants' counsel, either because (a) the claimants' counsel had expressly requested the debtor to communicate with them directly regarding the claims, or (b) the debtor's creditor list should have identified the claimants by reference to the names and addresses of their counsel.

For the reasons set forth above, I find the movants are entitled to file late proofs of claims.

the cases are factually quite different from the situation here.